Case 17-1677, Howard Pittman v. Experian Information Solution et al. Oral argument not to exceed 15 minutes for the plaintiff and 15 minutes will be shared by the defendants. And when ready, Mr. Moll for the appellant. Good morning, my name is Ed Moll, M-A-H-L is spelling of the last name, and it's my pleasure to appear before you this morning. And my first time before you, so I apologize if I'm a little bit nervous. Judges, this has been a lot of pleadings in this case, but it's an exceedingly simple case. Are you reserving any time? I'm reserving five minutes. All right, thank you. It's an exceedingly simple case. It's actually an unusual case in that all the parties are in agreement. Now, not all the attorneys are in agreement, but all the parties are in agreement. And I'd like to bring to your attention four matters, four statements that are attached to pleadings in this document that go to the facts of what happened here. The first one and the most important one is an email from Renee Cunningham, who's a risk manager at ISERV, which is the first servicer here at ISERV Servicing. And it's from her to an attorney by the name of Gilbert Borman, who was retained by Mr. Pittman to assist him to get a permanent loan modification. She investigated the matter and responded to Mr. Gilbert's request for a permanent loan modification by saying, and this email is not to Gilbert Borman, this is after she talked to Gilbert Borman, it's actually to Just for my own edification, which issue are you addressing at this time? The first issue I'm addressing is the fact that there is an admission by all the parties that there was a temporary loan modification agreement calling for three payments, a reduced amount. Those payments were made and a permanent loan modification agreement should have been sent to Mr. Pittman by April 1 of 2013. So I don't think there's any question about the three trial modifications, but when you talk about the email, are you asserting that the email should be viewed as constituting the submission of a permanent modification to Mr. whatever, Mr. Pittman? It's actually to Kristen Rakocsi over at the Second Service or BSI. Yet it is an admission by ISERV's representative that the agreement had been performed. What's the page number or reference to that? It usually says page ID in the upper right. Yes, it is docket 56, page ID 885. Okay, thank you. If I just might quote it, it says, please allow me to provide some background in this account. The borrower was in a trial modification with ISERV in December 2012 and made all payments on time, contractually entitling him to a permanent loan modification in April 2012. This is between ISERV and BSI in effect? That is, yes. And are you saying that that letter meets the statute of frauds? The letter is. Two people, neither of whom is the borrower? It wouldn't meet the statute of frauds because it's signed by a representative of ISERV and it's in writing. All right. But I'm presenting it as an issue. It doesn't mean that not every writing is signed constitutes a contract. Well, it doesn't constitute a contract to satisfy the statute of frauds as long as it's a signed memorandum that tends to prove the contract. Okay, go ahead. But recall that there is a signed contract called the TPP agreement from January of 2012. There's no doubt of that. The question is whether or not it was performed and whether or not ISERV failed to send a permanent loan modification to Mr. Pittman, as they were required to do. In this email, Ms. Cunningham is admitting to BSI that they failed to send a permanent loan modification to Mr. Pittman. She is saying that Mr. Pittman performed the agreement and that Mr. Pittman was contractually entitled to a permanent loan modification. And that is exactly our position in this case. Again, there's another document, which is document 88. Seeing that someone's entitled to that, it's not quite the same thing as signing an agreement providing or evidencing the loan modification. I take it there was never an actual dispute as to whether there was an agreement properly executed. And that also would invoke the issue of the statute of frauds. So what's your argument regarding whether the actual loan modification agreement was signed? I know there's some dispute as to whether the signature was adequate because there was some electronic signature and all that. Maybe you could address some of those things. Well, there's two documents. The process starts with the offer of a temporary loan modification agreement. That's the TPP notice that was sent to Mr. Pittman. That was signed by the Loss Mitigation Department of ISERV. And that says you make three payments and you're going to get a loan modification agreement, permanent loan modification agreement. This document appears in many places in the record. If I could just quote from it under frequently asked questions on the first page at the bottom. Now, I'm sorry, this is docket 61-3, page ID 1034. When will I know if my loan can be modified permanently and how will a modified loan balance be determined? Answer. Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modification loan. Any difference between the amount of this trial period payments and your regular. They didn't, in fact, do that, right? They did not. That's the whole case. They never did it. And they admit they did it. I mean, the problem is that that's not, in a FAQ, it's not an enforceable agreement itself in particular because it never says what the terms of the modification agreement will be. You might have a little more traction if it said we will send you a modification agreement with the following terms. But this can't be an agreement for a particular modification agreement because there are no terms in it. Well, I disagree with that, Judge. The terms are set forth in the first page, which shows payments of $1,357.80. And then it says this may be adjusted. It has to be adjusted because the arrearage at that point, which was two months for August and September, is going to be added to the unpaid principal. So the monthly payment is going to go up somewhat. And there may be also issues of taxes or insurance that's been paid. So that figure that's in the prior payment. I mean, you're just telling me that it's not definite. Even if you rely on your mortgage will be permanently modified, it might be modified to a 10-year term, a 20-year term, whatever. No. It's the amount that may be adjusted, the monthly amount that may be adjusted. The term is not going to be changed. How do you know? Does it say that? It just says your mortgage will be permanently modified. If I've missed it someplace else, let me know. But it says your existing requirements remain in effect during the trial period. But at least as I would read that, the servicer or the lender could say, okay, here's a modification. It's for this much for 20 years or it's for a different amount for 30 years. If you're going to change the length of the agreement, that would have been set forth in the trial modification plan. The only change. Why do you say that? Because it's not set forth in there. No, but why do you say that you would have? I can imagine bankers doing all sorts of things. Because they're saying all that's set forth as to a modification is the amount. They're not suggesting modification as to any other means. Okay. We've come to an impasse. Go ahead. Okay. Your time is running out. Let me ask you quickly. With respect to the reporting, you presented the stuff from the handbook about how they should report things. And in particular, as I read it, even if you can report that it's delinquent, you should also report that it's on a trial period or something of that sort. Am I following your claim correctly? Yes. As I read their claim, it sounds like they mutter they don't need to. But they also sort of say they did do it. Is there any kind of document that shows exactly what they reported or anything that would, in your view, that we should look at to see whether they did report that you were on a TPP or a modification plan? Well, the HAP guidelines, and I think it's Section 12. I've read that. I'm not asking what's in them. I'm asking is there any support for their saying that they did do something like they should have? No.   That's all I want to know. They said they didn't even know they needed to make a report. And if you look at there are the answers from the credit reporting agencies that were sent to my client after the dispute letter was sent. And if you look at the credit reports, and I think they're attached to our docket number 88. It's off the top of my head. But they are attached to our motion for summary judgment. They do not indicate that there's any reporting on either credit report from BSI or from ISERV as to any partial payment plan. And that's what they were supposed to report. And they were supposed to report a code of AC, and that's not reported. So you can just look at the credit report that I referenced in my pleadings, and nothing in there about a partial payment plan is reported. I know you're out of time. I'm sorry. Let me ask one quick thing here just from my own understanding. This loan was assigned from city court to Pacifica, and subsequently these servicers were employed to service the loan, ISERV and BSI. And this litigation obviously is with ISERV as defendant, and you've had litigation with BSI and ISERV. These services, are they the same as mortgage holders? If they're not the mortgagor, Sure. I'm just wondering why the litigation wouldn't be with the mortgage holder instead of servicers of the loan. Well, we filed a motion to add Pacifica, and Judge Roberts never decided that motion. That's my last argument in the case that we should have been allowed to add Pacifica to this case. Then we sued Pacifica in a separate action. But under the HAMP program, it is the servicer who has the contract with the HAMP administrator, which is Fannie Mae, and it's the servicers who are obliged to send the plans and follow through on doing the final agreements. Are you saying they stand in the shoes, then, of the mortgage holder? As far as the government is concerned, the servicer is the one they deal with. Now, sometimes the mortgage holder can also be the servicer. But in most cases, servicers are separate agencies. And your adversaries have not interposed as a defense that the servicers are agents of the mortgage holders. That doesn't seem to be a point of contention in this case. No, no. ISERB actually says in one of its briefs that we should not have served Pacifica because the agreements would have been with the servicer. So they're happy to affect the mortgage holder? Yeah, no, no. The servicers are the ones who are in the system, not the mortgage holders. Okay, thank you. Thank you. Morning, Counsel. Morning, Your Honor. May it please the Court, my name is Mickey Lee, and I represent ISERB in this matter. Co-Counsel, Mr. Mullett, represents BSI, and I'm going to reserve five minutes for his portion of the argument to address the arguments that are specific to BSI. All right. This Court should affirm the District Court conclusion that the appellant's FCRA claim fails because there was no enforceable loan modification agreement, and as a result, the information contained in his credit report was not inaccurate, and inaccuracy is an absolute requirement of an FCRA claim. Under Michigan law, what the appellant has referred to as the lender liability statute of frauds, a financial institution's promise regarding a financial accommodation like a loan modification is not enforceable unless it is in writing and signed by an authorized agent of that financial institution. And it can't be disputed here that the TPP needed to comply with the lender liability statute of frauds, which provides that a promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation must be in writing and signed by the authorized agent. And our brief sets forth numerous courts in this circuit and specific to Michigan federal court that says that loan modifications have to be in writing and signed by an authorized representative of the financial institution. We don't have that here. And we've cited this in our brief. One court specifically, and I think this sums it up perfectly. Michigan statute of frauds establishes that loan modifications are not enforceable unless memorialized in a writing signed with an authorized signature by the financial institution. Here, the appellant can't satisfy that requirement because the agreement being in writing and signed by an authorized agent. As the district court observed, as evidence of an enforceable agreement, Mr. Pittman produced an unsigned copy of the TPP and an email from ISERV's general counsel. The TPP, however, was not a loan modification agreement, and it wasn't signed. It only referenced the loss mitigation department at the bottom of that first page. And our brief sets these out as well. Again, numerous cases where Michigan courts have held that we're in agreement. Falling under the lender liability statute of frauds is not signed by a representative of the financial institution. It can't satisfy the statute of frauds. We've also cited opinions from this court that said TPPs, as a matter of law, aren't enforceable loan modifications. We've cited the Hall case and then the Goss case as well. Now, and your honors have picked up on this, as a matter of contract law, the TPP could not have constituted a loan modification agreement. The essential terms are absent from the TPP. The TPP informs the appellant that if he makes the three required payments, he will be sent a modification agreement detailing the terms of the modified loan. The TPP does not reference what the new monthly amount will be. It says that it's probably going to be close to what the TPP payments are going to be, but that's not certain. The TPP doesn't say what interest rate is going to be charged for the loan modification. And these last two are important. The TPP doesn't say what the unpaid principal balance of the loan modification is going to be. Obviously, the TPP is brought about because the borrower was in default and he has arrears. And in the TPP it says any arrears once the loan is modified, any arrears will be added to the unpaid balance. Are those arrears $3,000 or $30,000? That's a significant term that all parties should be aware of. That is that the arrearage would also depend in effect on what interest you were charging him during the trial period, which isn't actually specified. Correct. Interest, there's late fees that are at play. There are all sorts of numbers that could come into play that would potentially have a substantial impact on what the balance would be. But at the bottom, the TPP, in your view, simply isn't a contract. Because if it were, you would at least have violated it by not sending him a modification agreement of some sort. It's very far from a contract. But it does say we will send you a modification agreement. So if it were a contract, you would have violated that contract. I suppose if it were a contract. Pretty good English, isn't it? We will send you a modification agreement. It's our position. And the last thing that the TPP doesn't contain, and your Honor picked up on this, it doesn't say what the new terms are going to be. That I understand. I'm just saying that you have to tell me to some degree it's not a contract. I would respect that. If I could ask you to skip to one other thing. Did you say you have ten and he has five? Correct. Still, let me jump to this, which is that on the reporting, I understand your argument that even though he's on a TPP, he is still technically in default, he didn't make the earlier payments, and the TPP isn't the full amount, even though you're in a forbearance situation. But as I read the HAMP rules, and to me as a reasonable person, there's a pretty big difference between just being flatly delinquent and being in a conversation with the bank where they've agreed to let you do this TPP. And as I read it, that should have been reported. And I said to your adversary, maybe I'm wrong. I thought somewhere in the weeds here, one of you said, and by the way, we did anyway. Am I wrong about that, or are you relying on you didn't need to say that there was any kind of forbearance or TPP? It would be our position, your Honor, that reporting the forbearance or the TPP is at the discretion of the furnisher, or in this case, ISERV. And I'll read you the specific language from that section of HAMP. It says, if the borrower was delinquent at least 30 days past the due date prior to the trial period and the reduced payments do not bring the account current, servicers must, and I emphasize the word must, report the account status code that reflects the appropriate level of delinquency following the usual and customary reporting standards. That's precisely what ISERV did. Now, Section 12 goes on to state the servicer reports the modification when it is completed as well. The last sentence that I think your Honor is referring to says, the servicer should, and again I emphasize the word should compared to the word must previously in that section, the servicer should also report a special comment code AC, that being that the payment is under partial or modified payment agreement. So it's our position, your Honor, that also Section 12 of that particular section of HAMP encourages servicers to report. There's a clear distinction in the language between servicers must report in the account to reflect the appropriate. I understand that and I guess it wasn't even clear that the HAMP program over here could really control the FCRA, maybe it does, but if the standard is did you report incomplete or inaccurate information, isn't the failure to report the TTPP inaccurate or incomplete? And they asked that your obligation would have been to modify the report. I have no problem with your saying that it hurts their credit, might hurt their credit, all of that, but isn't it incomplete or inaccurate if you don't report the fact of the TPP? We don't believe so, your Honor. I think to the extent that anything would arise once the loan modification would be finalized, at that point there may be duties to report the loan modification, but as far as the TPP and there's other HAMP guidelines, Section 8.4 specifically says that the payments should be applied in the normal course, and in applying them that way, the delinquencies are still going to exist. I don't have, at least for me, I don't have any problem with that part of it, but wouldn't you agree that to a user of credit, there's a difference between a guy who's just skipped off to the Bahamas and not paid for a long time and a person who's on a TPP and in fact is making his payments? There is, but the issue here is whether or not under the FCRA with regards to the furnishers, the issue is not whether or not the account is accurate, it's whether or not they conduct a reasonable investigation. Because inaccuracies are permitted. You knew there was the TPP. It's not a question of the reasonableness of your knowledge, right? Because you knew it was there, right? That is correct. And we would fall back on that Section 112 language that just says the servicer should report it, but the absence of the word must, in our opinion, doesn't make it absolutely required. I see that I'm running out of time. So your position is not only that the loan modification agreement was not entered into, but you also would argue that there was no enforceable agreement to modify the loan pursuant to the TPP. Your position would be that with the email from ISERV's counsel and the TPP itself, those don't provide a basis for an enforceable agreement to enter into the modified agreement. Would you go that far? We would, Your Honor. And for two primary reasons. One, as I said, the TPP fell way short of constituting a valid and enforceable loan modification. As a matter of contract law, it fell way short of qualifying as enforceable contract. The second issue with the email was that from ISERV's counsel, that was since almost a year after ISERV stopped servicing the loan. And it's clear in the email that the counsel is saying, based on her understanding of what she understands of HAMP and what she has been told by BSI, that the loan modification has been approved. That email is pretty clear. The language that there's this trial period that the plaintiff is asked to or permitted to enter into, and the language from ISERV indicates that the trial period is temporary and your existing loan and loan requirements remain in effect and unchanged during the trial period. Then there are a number of conditions set out regarding how the loan will be modified and what the conditions of that would be. And I'm going to go through all of these, but the language seems to suggest that if he complies, he'll be bound by these conditions. So it seems to suggest that if he comports himself in conformance with the requirements of the trial period, he will receive this loan modification. I know there's a signature by the loss mitigation department of ISERV, and there might be some dispute as to whether that's an authorized signature. That's another problem. But there is a basis, at least, for an argument that he was being permitted to enter into and your client had agreed to consummate the loan modification if he adhered to certain conditions. What do you say to that? Well, the TPP does say that if these three – the TPP is basically a test run, if you will, to say if you can make these three payments, then we will sit down and we will modify your loan. But at the same time, while you're making these payments and even if we modify your loan, all of the original terms of the mortgage and of the note are still going to apply. You have to comply with those. So, for instance, you have to – you can't let – for instance, under the mortgage, if you have a second lien on the property, you have to notify the mortgage company or the servicer. All of those things that come into play that are in there. The core of the modification isn't contained in the TPP, and those are the things that I talked about earlier. What's the new payment amount going to be? What's the new interest rate going to be? What's the new payment amount going to be? Because that's admitted to in the record. And he was making those payments. He was. At that level. But that – those payments – and this was set out in the TPP. Those payments are going to be applied in the normal course. And so because he was in – he was in default and delinquent, when those payments come in, they're held in a separate account until there's enough money to pay the most – the oldest delinquent payment. And so by making his TPP-reduced payments at the time that I served transferred this loan to BSI. Well, the communication between the parties was that – I know we skipped – I think it was two payments that those payments would simply be added to the end of the loan. So, I mean, there was understanding as to some of these things. He skipped two payments before he even applied for the TPP, Your Honor. And so by the time that he actually made the first payment under the TPP, I think there were four or five payments that had not been made. So under what you have just explained, if they're going to be applied to the oldest delinquent payment and you're going to, I guess, use those current payments to pay the delinquency, he's always going to be delinquent, won't he? Wouldn't it be that he would never catch up because of the way the payments are going to be applied? That could present itself, Your Honor. I don't think that's the intent of what was going to happen. The problem is that the loan modification wasn't modified, permanently modified prior to when I stopped servicing the loan. I take it that if a permanent loan modification was offered and agreed to, that might have been the same amount, but it might have been a greater amount, it might have been a lesser amount. But if it was a modification, then it would wipe out whatever the previous problems were. It would be a novation. No, I don't believe it would wipe out the previous problems. It would reset the arrearage to the unpaid principal balance. It might contain whatever terms it contains. That is, you can imagine that as part of the modification, it would make some settlement of that. It would say, because it's a modification, it could be whatever. To the arrearage, yes. But the credit reporting is on a monthly basis. The credit reporting, right now I'm sticking to the modification. I'm just going to the point that there seemed to be an implication that if there was a modification, it would be at exactly $1,357.80. I'm saying in my understanding that's not right. It could have been more, it could have been less, depending on what's happening in the world. One other thing that I would add is that the terms of the loan would have to be adjusted. If this was a 20-year mortgage and we've shifted from him paying $1,900 a month to $1,200 a month, he can't possibly pay that off in the same amount of time. So there's going to have to be an adjustment made to the term. Well, I'm saying unless part of the council, in times of bad economic stress, people do all sorts of things. If he now seems to be a good guy and he says, hey, if you'll knock the loan down $20,000, I'll enter this and I'll pay you $1,500 a month, you might have gone for it in 2000. That's possible. 2012, right? That's what I'm saying. Just this whole thing is up in the air. It's not a contract yet on both sides, right? I would agree with that. Okay. The last point that I would make is that I've tried to touch on. Entering into the loan modification, and the appellant hasn't produced anything to suggest otherwise, entering into the loan modification doesn't wipe the slate clean on the payment history. And that's what's at issue here, the payment history. There's been no denial that he was delinquent, and in some cases seriously delinquent, on the payment histories prior to and as part of entering into the TPP. I'm not understanding your point here. I mean, if a loan modification agreement is entered into, his payment amount would change. I mean, prior payment history is what it is. And obviously, that would have to be addressed in some way. But presumably, he then would get a new payment amount, and there would be a new understanding going forward. That part is correct, Your Honor, but it doesn't wipe the slate clean, if I'm making myself clear. If he's missed five payments, or he's late on five payments, and that's how they report it to the credit reporting agency. Well, that's why the parties had agreed that the past-due payments would be added to the end of the reconfigured loan and would be added at the end of the new loan. That's the past-due amounts. There's a difference between the past-due amounts. If those are going to be added to the balance, that's one thing. But if he's missed five months' worth of payments, and those five months are reported as delinquent, regardless of what happens. But the amount owed for those five months are going to be added to the unpaid balance. He's still delinquent. That's just historical fact. Correct. The reporting history, it is what it is. Okay, that's all I have to say. Okay, then I have no further. Thank you, Your Honor. I appreciate the opportunity. Good morning. May it please the Court. Your Honor, I'm Christian Mullet on behalf of BSI. As a subsequent servicer, our arguments are essentially the same for all intents and purposes as I serve. We believe the trial court properly applied the Lender Liability Statute of Frauds, MCL 5661322, to determine that the trial period plan, or TPP, was not legally enforceable. In this case, the appellant just can't get around the fact that there was no permanent loan modification. The court properly recognized that in order for it to be an enforceable agreement, a loan modification must be signed by both the borrower and financial institution. That's the Voyendoff case. The court commented that the statute of frauds forbids enforcement of a financial contract that is not in writing and signed by an authorized rep. Let me ask you this. Was there an agreement between the parties to enter into a permanent loan modification agreement if the mortgagor successfully performed certain tasks and obligations? Well, accepting your statement that the permanent loan modification agreement was not signed, had there been or was there an agreement between the parties to enter into a permanent loan modification if the plaintiff qualified by performing certain tasks that had been set out between the parties? Well, it's my understanding that, first of all, the TPP was offered by ISERV prior to the service transfer. The service transfer was in June of 2012, and the TPP called for the borrower to make three payments, and I believe it was in early 2012. At that point, according to the face of the TPP, once the borrower made those three payments, that a proposed modification, a permanent loan modification, would be sent to and executed by the borrower. Then it would have to be also executed by the lending institution or the servicer here. At the time, it would have been ISERV. And then when it was transferred to us in June of 2012, there had been no modification that was signed by the lender, and no modification was ever signed by BSO. So he was still sending these amounts kind of gratuitously, and you were accepting them gratuitously without any legal obligation? Is that kind of the? That's exactly it. They were saying that spending the lower amount was a 1341. You knew about all of these TPP documents, though, right? We knew that the TPP was offered by ISERV. Of course, because that leads me to the question I have as to different, which is their breach of contract claim, which is, as I understand the facts, and tell me if I'm wrong, you took the money and never paid the property taxes. Well, the property taxes were eventually taken care of, and actually the property has since been sold. But with that said. We didn't pay it for a while, and at least the allegation is he had to pay them. So that is some damage. I mean, that's a liability, but that's damage, isn't it? Yeah, but the court also concluded, Your Honor. I understand what they concluded. I'm just going at it piece by piece. So let's talk about is there liability. And the question there is your position is, I take it, that they breached first. They breached first. Okay, question. Are you familiar with our court's moderately recent case of Jawad v. Hudson City Savings Bank, 636 Fed Appendix 319, which says that missing a couple of payments is not an initial breach in this type, is not a breach that justifies breach on the other party's side, because normally preliminary breach has to make it impossible to continue to perform. And here we've got money on both sides. Usually if you've got money just tossed around, it's not a breach. And that's what Jawad says. I don't know if you're familiar with it. Your Honor, I'll be honest with you. I'm not familiar with it. But the court ruled on the Chrysler v. Cherokee case, which is from the Sixth Circuit here, and it stands for the proposition that one who commits the first substantial breach cannot maintain an accident. The question, though, is what is a substantial breach? Is failing to make a couple of payments a substantial breach something that allows you then just to keep their money and not pay the property tax? We believe that the trial court here determined that failure to make the payments in August of 2011, as well as September, was a substantial breach because the escrow account would have been deficient at that point in order to cover the taxes. I'm sorry. When you say the escrow account would have been deficient? Well, he's making the short payments instead of the normal $1,700, $1,800. The escrow accounts were short in order to be a negative escrow in order to make the payments. They're not making escrow payments anyway. Not at all. You know, Your Honor, I mean, the TPP fact refers to that. It says it should be sufficient to pay the property taxes. Right. But it says if you – it effectively says there might be an escrow shortage, but, you know, whenever I have an escrow shortage, they tell me how much it is. They don't just keep the money and not pay it. I'm wondering why you think there was a substantial breach because when you have a piece of real estate, you think there's a substantial breach when mortgage foreclosure has been instituted and missing a couple of payments, and even then there's a redemption period and all that. I don't see how there's a substantial breach if you hadn't even seen fit to institute mortgage foreclosure proceedings against the property. You're right. Mortgage foreclosure was never instituted in this case and it wasn't involved. And once litigation came in, it was put aside and it hasn't been moved for foreclosure. And eventually now it's not even an issue because that property has been sold. After a permanent modification through this litigation, it was joined by all the parties in September of 2016. But back to your point, I believe that missing a couple of payments in August and September of 2011 constitutes a substantial breach. And even more so, the trial court here determined that it was a substantial breach. Well, we're reviewing – Yeah, their decisions. So if the trial court made an error, the fact that the trial court made an error isn't something that supports the trial court's error. Yeah. Well, I would say that with regards to the servicing of the loan, if you're not making your payments, that constitutes a substantial breach, which usually results in foreclosure proceedings. Thank you. Thank you very much. It was a pleasure to be here. Pleasure having you. Rebuttal. There is so much there that was said by especially Mr. Lee that I don't really have time to respond to all of it. I just want to make a couple of things clear. First of all, when he interprets the HAMP guidelines as saying that they don't have to make partial payments because he uses the word should, well, HAMP guidelines are not statute, so they're not going to use the word must or shall. They're going to say this is what you should do. They wouldn't go through all the trouble of setting forth the criteria for making partial payments, the code you're supposed to report without intending that the servicers do so. Even if you didn't have the HAMP guidelines, you still have the Fair Credit Reporting Act that requires that information be complete and accurate. And you've got the regulations of the Consumer Financial Protection Bureau that I quote that say that you are supposed to provide information which, if not provided, would provide a misleading picture about the debtor. A misleading picture is something that doesn't provide a full indication of the character and the performance of the debtor. And that applies in this case because the word they use in the regulations is integrity, not just accuracy but also integrity. You're supposed to present a fair picture of the debtor, not a one-sided, even technically accurate picture of the debtor. And that did not happen in this case because they did not make credit reporting. But they admit in their notes they didn't even know they had to. ICER didn't know what the HAMP regulations provided. As to the last point that Mr. Mullet made about going on and accepting payments at a reduced rate, he used the word gratuitous or accepted the word gratuitous. That is not what the factual situation is. What happened is that Kristen Rakosche at BSI told Gilbert Borman on March 26, 2013, have him to continue to make the trial payment amount. I will get the mod payment as close as I can to that. So that's what happened. ICER didn't follow through and send the Permanent Loan Modification Agreement. BSI said continue making payments for the ongoing period of time indefinitely until we get this straightened out. They never straightened it out. Now as to the question of what document is being enforced, we're not saying we're enforcing a Permanent Loan Modification Agreement. That agreement was never entered into because it was never mailed by ICER. But ICER was obligated to mail that under the terms of the TPP notice, which is a binding contract. It was signed electronically by the Loss Mitigation Department of ICER and bound ICER to send that agreement when the three payments were made. And there's never been any contention by anybody at ICER that they were not obligated to send that. I quoted There was no way of case law that that electronic signature on behalf of the company was a sufficient signature in lieu of an authorized signature. Well, it would be authorized because this is the Loss Mitigation Department. Or whether that actually is an authorized signature. It's the Loss Mitigation Department. So they were the ones who would be in a position to offer loss mitigation alternatives. Now is the fact that it's Well, there are some cases to say that an authorized signatory has to sign. And whether a signature of that kind as we have here is sufficient might be a matter of some debate. I mean, it's just words. It's not what we would normally, at least my copy. And I'm not sure this is my clerk's. There's sort of a scroll to the left. But is it just the words Loss Mitigation Department counts as a signature? I would say so, yes, because it identifies who is sending it and shows Lots of things identify. I mean, I get a blank and it says Danny J. Boggs under it. That identifies it. But if I don't sign it, it's not a signed document. Do you have any cases that address this issue? Well, yes. I think the leading case of Wygaud involves exactly the same type of signature from That's from the Seventh Circuit. That's from the Seventh Circuit, but it's widely followed, including in this circuit. And I think in that case there was just a written signature, a written identification of Wells Fargo Bank as a party sending that. How do you spell that Wygaud? W-I-G-O-D versus Wells Fargo Bank. It's probably the most quoted case in this context. So they're making exactly the same argument that Wells Fargo Bank made in Wygaud. They're saying, well, there was never any permanent loan modification. The Seventh Circuit said, well, of course there wasn't. You didn't do your job. You didn't do what you were obligated to do. They are the ones who are to blame for there not being a permanent loan modification. They're the ones to blame for there being continuing partial payments. They're the ones to blame for making misleading reporting to the credit bureaus. All the fault is on their side. Mr. Pittman did exactly what he was told to do punctiliously and timely, and he was left to hang out there for months, not knowing what was going to happen, being afraid of what was going to happen regarding his house, not knowing what damages he might suffer from bad credit reporting. So this is a clear case, and Mr. Pittman should have won on his motion for summary judgment. Now, I ran out of my time? Okay, I'm sorry. I'm sorry. Thank you very much. Thank you, and the case is submitted.